# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEXAS PACIFIC LAND CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-1066-JTL |
| | ) | |
| HORIZON KINETICS LLC, HORIZON | ) | |
| KINETICS ASSET MANAGEMENT LLC, | ) | |
| SOFTVEST ADVISORS, LLC, and | ) | |
| SOFTVEST, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL OPINION

Date Submitted: July 10, 2023
Date Decided: December 1, 2023

A. Thompson Bayliss, Adam K. Schulman, Peter C. Cirka, G. Mason Thomson, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Yolanda C. Garcia, Tayler G. Bragg, SIDLEY AUSTIN LLP, Dallas, Texas; Alex J. Kaplan, Charlotte K. Newell, Robert M. Garsson, Cassandra Liu, Deborah Sands, SIDLEY AUSTIN LLP, New York, New York; Elizabeth Y. Austin, SIDLEY AUSTIN LLP, Chicago, Illinois; Robin Wechkin, SIDLEY AUSTIN LLP, Issaquah, Washington; *Counsel for Plaintiff Texas Pacific Land Corporation.*

Rolin P. Bissell, James M. Yoch, Jr., Alberto E. Chávez, Michael A. Carbonara, Jr., YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Christopher E. Duffy, John Goodwin, VINSON & ELKINS LLP, New York, New York; Robert Ritchie, K. Virginia Burke DeBeer, VINSON & ELKINS LLP, Dallas, Texas; *Counsel for Defendants Horizon Kinetics LLC, Horizon Kinetics Asset Management LLC, SoftVest Advisors, LLC, and SoftVest, L.P.*

**LASTER, V.C.**

A board of directors recommended that stockholders vote for a charter amendment to increase the corporation's authorized shares. The defendants voted against the amendment. The corporation asserts that a stockholders agreement bound the defendants to follow the board's recommendation. The defendants respond that exceptions to the voting commitment enabled them to vote against the amendment. They also say that the doctrine of unclean hands bars the corporation from relying on the voting commitment because the directors breached their duty of disclosure when soliciting stockholder approval.

This post-trial decision holds that the defendants breached the voting commitment. The exceptions are ambiguous, but the extrinsic evidence establishes that the commitment bound the defendants to vote with the board. The disclosure violations do not negate the defendants' contractual obligation. Plus, the defendants were guilty of worse misconduct.

As a remedy, the court applies the equitable maxim that treats as done what ought to have been done. The defendants' shares are deemed voted in favor of the amendment. Accordingly, the amendment is declared to have been approved.

## I. FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Having evaluated the credibility of witnesses and weighed the evidence, the court makes the following findings.[1]

---

[1] The parties agreed to fifty-eight stipulations of fact, cited as PTO ¶ —. Six fact witnesses and three expert witnesses testified during a one day trial. The parties introduced 1,091 exhibits, including deposition transcripts from fifteen individuals. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form

**A.     The Company**

Texas Pacific Land Corporation (the "Company") is one of the largest landowners in Texas. The Company's predecessor—the Texas Pacific Land Trust (the "Trust")—was formed in 1888 to hold land previously owned by the bankrupt Texas and Pacific Railway Company. The railroad had mortgaged its real estate to secure bond issuances. When the railroad defaulted, the Trust was formed for the benefit of the bondholders, and the bondholders received trust certificates representing their proportionate economic interest in the Trust. The declaration of trust prevented the Trust from issuing more trust certificates.

Three trustees governed the Trust's affairs. Once elected, each served until resignation, disqualification, or death.

**B.     The Proxy Contest And Settlement Agreement**

In February 2019, one of the trustees resigned, creating a vacancy. The two remaining trustees—John R. Norris and David E. Barry—nominated Donald G. Cook, a retired four-star general, to fill the vacancy.

A group of investors owning approximately 25% of the Trust certificates opposed Cook's nomination, The investors nominated Eric Oliver, the founder and president of SoftVest Advisors, LLC ("SoftVest"), an investment advisor with a fund that held a significant number of Trust certificates.

---

"JX — at —" reference trial exhibits and use original pagination when available. If more convenient, trial exhibit citations reference internal paragraphs or sections.

A proxy contest ensued. As part of that fight, the Trust sued Oliver in federal court.

In July 2019, the parties reached a settlement that included the Trust's agreement to form a committee that would evaluate the possibility of converting into a corporation (the "Conversion Committee"). The members of the Conversion Committee included Norris and Oliver. The other members were Murray Stahl of Horizon Kinetics Asset Management ("Horizon"); Craig Hodges of Hodges Capital; and Dana McGinnis of Mission Advisors. All controlled investment advisors with funds that owned significant numbers of Trust certificates. Each was part of the group that opposed Cook's nomination.

## C. The Conversion Committee Recommends A Conversion.

In January 2020, the Conversion Committee reviewed draft resolutions recommending that the Trust convert into a Delaware corporation. They also reviewed a plan of conversion for accomplishing it (the "Conversion Plan"). Sidley Austin LLP presented the Conversion Plan. JX 71.

After the presentation, the committee members "engaged in a discussion among themselves and with Sidley regarding the number of shares of common stock of the Potential Corporation to be authorized under the certificate of incorporation." *Id.* at 2. Oliver, Stahl, and Hodges opposed the issuance of additional shares. They wanted the corporation to operate as the Trust had historically by not issuing additional equity. Stahl Tr. 192–93; Oliver Tr. 245–46. No decision was reached, and the resolutions were amended to state that the Trustees would "continue to consult with the Committee on … the number of authorized common shares." JX 71 at 2.

3

The Conversion Committee unanimously adopted the revised resolutions and recommended that that the Trustees approve the Conversion Plan. The plan documentation had two parts. Annex A described the steps involved in the conversion. It noted that the Trust would form the Company as a wholly owned subsidiary and then spin it off, "distributing all shares of its common stock to holders of sub-share certificates of the Trust." *Id.* at 9. An organization chart reflected that the Trusts' existing certificate holders would "receive 100% of the shares of common stock of [the Company] as a distribution in liquidation of [the Trust]." *Id.* at 12. That was an accurate description of what happened. It did not memorialize an agreement on whether the Company could issue additional equity.

Annex B provided "an overview of key governance terms" for the Company. *Id.* at 14. The annex identified fifteen items:

(1) stockholder representation on the board of directors (the "Board"), "[s]ubject to negotiations of a shareholder agreement containing customary standstill provisions.";

(2) a classified board structure;

(3) majority voting for director elections;

(4) the ability of stockholders to act by written consent only if requested by the Board;

(5) director removal for cause by at least a majority of the outstanding shares;

(6) a 90-120 day advance notice requirement for director nominations and stockholder proposals;

(7) giving the Board the exclusive right to fix its size at between seven and eleven members;

(8) giving the Board the exclusive power to fill director vacancies;

4

(9) requiring the affirmative vote of a majority of the outstanding shares for adopting, amending, or repealing bylaws;

(10) an exclusive forum provision in the charter designating the courts of Delaware and Texas;

(11) authority to issue blank check preferred stock;

(12) indemnification;

(13) directors and officer insurance;

(14) advancement; and

(15) director exculpation.

*Id.* at 14–18. The list of key governance terms did not identify an agreement on the corporation's authority to issue new shares. That point had been left open.

**D.      The Stockholders Agreement**

Over the following months, the Trust negotiated a stockholders agreement with the investors who wanted representation on the Board. SoftVest, Horizon, and Mission Advisors executed the final agreement. JX 116 (the "Stockholders Agreement" or "SA"). SoftVest designated Oliver as its director representative; Horizon designated Stahl; and Mission Advisors designated McGinnis. In each case, the investment advisor and the fund that held Trust certificates and would hold Company shares after the conversion signed the Stockholders Agreement.[2] Hodges and his firm did not sign.

---

[2] For Horizon and SoftVest, the signatory entities are (i) Horizon Kinetics LLC and Horizon Kinetics Asset Management LLC and (ii) SoftVest Advisors, LLC and SoftVest, L.P. The Mission Advisor entities are not relevant to this action.

Section 2 of the Stockholders Agreement, titled "Voting Commitments and Restrictions," stated that the signatory stockholders must

> vote all shares of Common Stock beneficially owned by such Stockholder and over which such Stockholder has voting authority at each Stockholder Meeting in accordance with the Board's recommendations as such recommendations of the Board are set forth in the applicable definitive proxy statement filed with the SEC (the "Board Recommendations").

SA § 2(a) (the "Voting Commitment").

> The Voting Commitment was subject to two exceptions:
>
> Notwithstanding [the Voting Commitment], the Stockholders shall not be required to vote in accordance with the Board Recommendation for any proposals
>
> (i) related to an Extraordinary Transaction or
>
> (ii) related to governance, environmental or social matters; *provided, however*, that the Stockholders shall be required to vote in accordance with the Board Recommendation for any proposal relating to any corporate governance terms that would have the effect of changing any of the corporate governance terms set forth in the plan of conversion recommended by the Conversion Exploration Committee of the Trust on January 21, 2020.

*Id.* § 2(b) (formatting added). The first exception is the "Transaction Exception." The second exception is the "Subject Matter Exception." The Subject Matter Exception contains an exclusion, *i.e.*, an exception to the exception, that restores the obligation to comply with the Voting Commitment "for any proposal … that would have the effect of changing any of the corporate governance terms set forth in the [Conversion Plan]" *Id.* (the "Conversion Plan Exclusion").

Section 3 of the Stockholders Agreement imposed a standstill (the "Standstill"). The Standstill stated: "Except as otherwise provided in this Agreement, without the

6

prior written consent of … the Board[], the [signatory stockholders] shall not, and shall cause their Affiliates and controlled Associates not to, directly or indirectly (in each case, except as permitted by this Agreement)" engage in a series of acts. *Id.* § 3. Five of the acts prohibited the signatory stockholders from taking any action to

> (i) … nominate, recommend for nomination or give notice of an intent to nominate or recommend for nomination a person for election at any Stockholder Meeting at which directors are to be elected;

> (ii) initiate, encourage or participate in any solicitation of proxies in respect of any election contest or removal contest with respect to directors;

> (iii) submit, initiate, make or be a proponent of any stockholder proposal for consideration at, or bring any other business before, any Stockholder Meeting;

> (iv) initiate, encourage or participate in any solicitation of proxies in respect of any stockholder proposal for consideration at, or other business brought before, any Stockholder Meeting; or

> (v) initiate, encourage or participate in any "withhold" or similar campaign with respect to any Stockholder Meeting ….

*Id.* § 3(a).

A sixth prohibition prevented the signatory stockholders from taking any action to "seek publicly, or alone or in concert with others, to amend any provision of the Governance Documents." *Id.* § 3(e). The Stockholder Agreement defined "Governance Documents" as "the Charter, the Bylaws …, committee charters, corporate governance guidelines or similar publicly-disclosed governance documents[.]" *Id.* § 1(d).

A seventh prohibition barred the signatory stockholders from (i) making any public or private proposals (other than to the Trustees or the Board) or (ii) making

7

any public statements or otherwise seeking to encourage, advise or assist any person, in each case with respect to:

> (A) any change in the number or term of directors serving on the Board or the filling of any vacancies on the Board,
>
> (B) any change in the capitalization, dividend or share repurchase policy of [the Company],
>
> (C) any other change in the Trust's or [the Company's] business, operations, strategy, management, governance, corporate structure, or other affairs or policies,
>
> (D) any Extraordinary Transaction,
>
> (E) causing a class of securities of the Trust or [the Company] to be delisted from, or to cease to be authorized to be quoted on, any securities exchange or
>
> (F) causing a class of equity securities of [the Company] to become eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act[.]

*Id.* § 3(g).

### E.     The Debate Over Authorizing More Shares

On January 11, 2021, the Trust converted into the Company. The Company's amended and restated certificate of incorporation (the "Charter") fixed the total number of the authorized shares of common stock at 7,756,156, all of which were distributed to the former holders of Trust certificates. That meant that the Company lacked the authority to issue additional shares of common stock.

Soon afterward, the Board and management began considering whether to seek authority to issue more shares. During a meeting on February 17, 2021, the Board "discussed the possibility of implementing a stock split but did not reach a

decision to do so and instead asked for an updated analysis on this topic from Credit Suisse for consideration at a future meeting." JX 154 at 367.

During a Board meeting on May 3, 2021, Credit Suisse gave a presentation on a potential stock split. JX 172 at 85, 94–97. Credit Suisse commented that it "is unusual for a public company to have no authorized but unissued shares available for use with M&A transactions and compensation." *Id.* at 85. Credit Suisse also noted that the Company's "[r]ecent outsized share performance … creates an opportunity for stock focused mergers … that will be highly accretive on a per share basis on all metrics[.]" *Id.* at 94. Credit Suisse concluded that "[a]n increase in the amount of shares authorized will provide [the Company] flexibility to investigate these potential opportunistic transactions[.]" *Id.* The directors discussed the Company's "unusual situation with respect to the negotiated reorganization from a trust to a corporation, including the concern about dilution." *Id.* at 85.

The Board revisited the topic of increasing the authorized shares during a meeting on August 11, 2021. Credit Suisse gave a presentation about "the advantages of having authorized shares available for issuance in connection with acquisitions, and recommended authorizing additional shares even if no specific use is known or planned for them yet." JX 183 at 145. After the presentation, the "Board held a long discussion about these topics." *Id.* Norris and Barry, the Board's Co-Chairs, proposed an increase of 585,000 shares, with 85,000 shares set aside to fund equity incentive plans for management and 500,000 shares for unspecified uses. *Id.* at 152. No consensus was reached, and the Board tabled the discussion. *Id.*

9

On September 10, 2021, the Board held a special meeting to consider increasing the authorized shares. Management "led a discussion regarding management's growth strategy, and in particular relating to the use of capital and acquisitions." JX 194 at 59. Stahl and Oliver argued against authorizing more shares, and the Board could not reach consensus. *Id.* The Board tabled the issue again. *Id.*

## F.    Stahl And Oliver Discuss The Voting Commitment.

Three day after the September 10 meeting, Oliver emailed with his son about the Board's interest in authorizing more shares. Demonstrating his understanding that the Voting Commitment bound Horizon to vote in favor of a Board-endorsed proposal to increase the authorized shares, Oliver stated: "We are also lobbying for our ability to vote against if the Board does move forward." JX 196 at 8. His son responded "Right, I get that. It's an uphill battle." *Id.*

On October 7, 2021, Stahl discussed the same issue with two other stockholders. One was Lawrence Goldstein, who took notes that state:

> Next meeting ... They wanted to increase shares outstanding and
> How did analyst report know the o [sic] was planning to increase shares
> As long as Murray is[ ]ON THE BOARD HE Must [sic] vote with them

JX 210. Goldstein's notes reflect Stahl's contemporaneous understanding that Horizon had to comply with the Voting Commitment for purposes of a Board-endorsed proposal to increase the authorized shares. By contrast, Stahl understood that he did not have to comply with the Voting Agreement for a spinoff, presumably under the Transaction Exception. *Id.* ("Plan was to spin off the water business. They can only sell more shares with Murray voting against that. Free to vote For [sic] spin of [sic].").

Goldstein's notes summarize the Voting Commitment as follows: "DOES NOT HAVE

10

TO VOTE WITH THEM ON NON PEDESTRIAN THINGS HE CAN VOT[E] ON BIG THINGS[.]" *Id.*[3]

## G.    The Company Pursues Acquisitions.

One of the reasons why management wanted to increase the Company's authorized shares was to facilitate acquisitions. In November 2021, the Company began exploring a purchase of assets from Occidental Petroleum ("Oxy"). In February 2022, the Board formed a special committee to consider potential acquisitions (the "Strategic Acquisitions Committee"). Over the next ten months, management and the Strategic Acquisitions Committee considered eighteen different transactions, none of which resulted in a binding offer or signed agreement. JX 598 at 6–11. The two largest transactions were the potential asset purchase from Oxy and a potential merger with Brigham Minerals, Inc. ("Brigham").

The Oxy transaction fell apart over price. In April 2022, Oxy signaled a purchase price in the range of 12x EBITDA, above the Company's range of 8x to 10x EBITDA. The Strategic Acquisitions Committee and management discussed Oxy's ask. Management reported that Oxy was interested in consideration that included stock and asked for a premium because of "perceived execution risk on the part of the Corporation to be able to get necessary approvals and consummate the transaction …." JX 360 at 3. The potential transaction died shortly thereafter.

---

[3] Stahl claimed the call never took place. Stahl Tr. 227–28. That testimony was not credible.

11

Contemporaneously, management internally expressed its desire to increase the number authorized shares to facilitate acquisitions. An internal management presentation from April 2022, flagged that the Company's "access to capital (i.e., authorized shares) has become a primary barrier to progressing transactions to formal decision points." JX 318 at 8.

The Brigham transaction suffered a similar fate. In July 2022, the Company submitted a non-binding offer to acquire Brigham for stock worth $1.746 billion. JX 1034 at 2–3. In September, Brigham announced a transaction with a competing bidder. JX 420. Barry told the directors other than Oliver and Stahl that the Company's bid was "on target" but failed because the Company was not authorized to issue stock. JX 422. He asked whether it was "worth considering a competing bid for Brigham if we get the stock authorization?" *Id.* The consensus was that the "ship has sailed" and the deal was lost. *Id.*

## H. The August 31, 2022 Board Meeting

During a meeting on August 31, 2022, after losing the Oxy deal and the Brigham deal, the Board revisited the idea of increasing the authorized shares. JX 462. Management proposed an increase of 38,780,780 shares to an aggregate of 47,536,936 shares, sufficient to permit a 3-for-1 stock split that would take the form of a stock dividend with additional shares "for future as-of-yet undetermined uses." *Id.* at 9. Management explained that the additional shares "would give the Corporation flexibility with respect to future uses of shares, including as consideration for acquisitions, equity compensation, and other possible uses." *Id.*

12

Stahl and Oliver opposed the proposal. Stahl was willing to support the shares necessary to effectuate the stock split, but would not support a higher number. Oliver agreed. The other directors believed that the increased share authorization "was in the best interest of stockholders and was in line with the majority of other public companies." *Id.*

Over Stahl and Oliver's opposition, the Board approved a proposed charter amendment to increase the authorized number of shares. They resolved to submit it to the stockholders at the Company's 2022 annual meeting. The Board scheduled the meeting for November 16, 2022, with a record date of September 22, 2022.

## I.    The Proxy Statement

On October 7, 2022, the Company filed its definitive proxy statement for the annual meeting. JX 431 (the "Proxy Statement"). The Proxy Statement listed the proposed increase in the authorized shares as Proposal Four, explaining that "[i]f stockholders approve the Authorized Shares Amendment, it would permit the Board to effect a potential 3-for-1 split of the Company's Common Stock in the form of a stock dividend of 2 shares per outstanding share totaling 15,421,864 based on the number of shares outstanding on September 22, 2022 [.]" *Id.* at 23. The Company did not commit to implement the stock split.

The Proxy Statement reported that the Board recommended a vote in favor of Proposal Four. The Proxy Statement did not disclose that Stahl and Oliver dissented from the Board vote.

The Proxy Statement explained that in addition to the stock split, the Company could "use its ability to issue additional Common Stock for other purposes

13

in the future, including: the sale of securities to raise capital; payment of consideration for acquisitions; payment of stock dividends; grants made to employees under new or expanded existing compensation plans or arrangements; and other corporate purposes." *Id.*

The explanation for the Board's recommendation elaborated on the Company's ability to use the additional shares for acquisitions:

> An increase in the number of authorized shares of Common Stock would also provide the Company with flexibility with respect to future transactions, including acquisitions of additional assets where the Company would have the option to use its Common Stock (or securities convertible into or exercisable or exchangeable for Common Stock) as consideration (rather than cash), financing future growth, financing transactions and other general corporate purposes. Any of such transactions, facilitated by the issuance of additional shares of Common Stock, could have the potential to benefit the Company and stockholders by, among other things, growing the Company's business or assets, increasing stockholder value, or increasing the marketability and liquidity of the Common Stock.

*Id.* Later in the Proxy Statement, the Company reiterated that "the Company desires to have the flexibility to use Common Stock as consideration for the acquisition of additional assets." *Id.* at 24. In the same paragraph, the Proxy Statement warned that the lack of authorized shares could interfere with the Company's ability to pursue transactions:

> The Board believes that, in the future, occasions may arise where the time required to obtain stockholder approval might adversely delay or prohibit the Company's ability to enter into a desirable transaction or deny it the flexibility to facilitate the effective use of its securities. Therefore, failure to approve this Proposal Four, in addition to prohibiting the Stock Split, could, in effect, prevent the Company from pursing strategic acquisitions.

14

*Id.* Although discussing potential acquisitions, the Proxy Statement stopped short of disclosing the existence of the Strategic Acquisitions Committee.

Despite providing these disclosures, the Proxy Statement cautioned that "[o]ther than with respect to the Stock Split and under the Incentive Plans, the Company does not have any present intention to issue Common Stock in the immediate future." *Id.* The Company further cautioned that "[t]he submission of this Proposal Four is not part of any other existing plan of the Board to engage in any transaction that would require the proposed increase." *Id.*

## J.     Horizon And SoftVest Oppose Proposal Four.

Horizon and SoftVest mobilized against Proposal Four. On October 10, 2022, Horizon's general counsel emailed a representative working at the New York Stock Exchange asking for clarification on whether Proposal Four was properly deemed a routine matter under NYSE Rule 452. He wrote:

> In previous public fillings and conference calls, the company has indicated that the purpose of increasing shares is to effectuate mergers and/or acquisitions.
>
> While I understand that generally amendments to a certificate of incorporation can be deemed routine matters, my understanding is that matters relating to mergers and acquisitions are non-routine. As such, can you kindly confirm that this mater [sic] has been properly coded as routine and provide the basis for the same?

JX 440. The New York Stock Exchange answered that Proposal Four was "routine," explaining "[i]f there was a definitive agreement for an M&A transaction (that required shareholder approval) and they needed shares to fund that transaction, we would then deem it non-routine but just providing indications of interest would not cause the proposal to be non-routine." *Id.*

15

A few days later, Horizon and SoftVest expanded their efforts. On October 12, 2022, Oliver texted Company stockholder, Minor Alexander stating "Hope all is well with you and the family! Let me know a good time to go over the TPL proxy." JX 437. Alexander responded the same day, stating "That would be great. How about tomorrow morning 10 AM?" *Id.* At trial, Oliver admitted to having "some influence" over Alexander. Oliver Tr. 280.

On October 15, 2022, a Company stockholder texted Oliver, stating "I wanted to vote TPL the way that helps you the most. Can you direct me?" JX 444. Oliver responded, "Y[es] Call me when you want to discuss." *Id.*[4]

On October 17, 2022, a Company investor posted a sample ballot on his blog that voted against Proposal Four. JX 450 at 3. That same day, Oliver forwarded the ballot to other stockholders with the message "Do this!" JX 448, JX 449, JX 453. The recipients understood that Oliver was instructing them to vote against Proposal Four. *E.g.*, JX 453.

One of the recipients was Alexander, whom Oliver reached out to regarding the proxy days earlier. JX 449. Alexander responded: "Will Do! I've sent this out and spreading the word! Keep up the great work Eric!" *Id.* At Oliver's direction, Alexander lobbied other stockholders by forwarding the ballot and including messages like "I caught up with [Oliver] recently and he said there is another crucial TPL proxy vote

---

[4] At trial, Oliver refused to admit that the "Y" at the beginning of his response to the stockholder's request meant yes. Oliver Tr. 281–82. Given the context, that testimony was not credible.

16

coming up soon. He suggested voting as attached. I can better explain in person if you have any questions." JX 451 at 3–7. In other correspondence, Alexander noted that Oliver "asked If I would help spread the word to other shareholders." *Id.* at 4.[5].

Oliver had other conversations in which he advocated against Proposal Four. On November 3, 2022, Mark Clift, an investment advisor, texted Oliver asking, "What are your thoughts on how I should encourage my investors to vote on the TPL Proxy?" JX 482. Oliver responded, "Call me[.]" *Id.* On November 8, in a text conversation with Alexander, Clift confirmed that "I talked to [Oliver]. I encourage all my investor [sic] vote no on issuance of more shares and yes on all other." JX 502.

On November 9, 2022, a stockholder reached out to Oliver regarding Proposal Four. JX 509. The stockholder wrote, "Wanted to get your take on the TPL vote for a split and additional share issuance. Any guidance would be great." *Id.* Oliver responded by stating: "There is a blog I'll send you a link. He has a recommended ballot." *Id.*

## K. The Company's Fight Letter

The Company campaigned in favor of Proposal Four. On November 8, 2022, the Company issued a letter to the stockholders advocating that they approve Proposal Four. JX 511 at 2–7 (the "Fight Letter").

The Fight Letter touted in bold font that "all three proxy advisory firms – ISS, Glass Lewis and Egan Jones – have recommended that stockholders vote FOR

---

[5] At trial, Oliver could not recall whether he asked Alexander to spread the word. Oliver Tr. 286. Given Oliver's recall of other events, his failure of memory seemed selective.

Proposal 4." *Id.* at 2 (emphasis removed). The Company then quoted from each report, including the following passage from Glass Lewis:

> The Company currently does not currently have sufficient shares available for issuance to meet its existing obligations. We are concerned that the Company is unable to meet its current and potential obligations and believe it is important that the Company obtain additional common shares available for issuance in the future.

*Id.*

On cross-examination at trial, Company director Karl F. Kurz was asked about the accuracy of the statement that the Company "does not currently have sufficient shares available for issuance to meet its existing obligations." Kurz Tr. 68. He testified that the Company could meet its existing obligations and admitted that the statement appeared false. *Id.*

**L. Horizon and SoftVest Vote Against Proposal Four.**

Horizon and SoftVest (the "Investor Group") voted their shares against Proposal Four. On November 15, 2022, the Company disclosed their votes.

On the morning of November 16, 2022—the date of the annual meeting—the Company announced its intent to keep the polls open and adjourn the 2022 annual meeting "only with respect to [Proposal Four] … if [Proposal Four] does not receive the requisite number of votes at the Annual Meeting and the failure of [the Investor Group] to vote in support of [Proposal Four] is determinative of such outcome." PTO ¶ 64; JX 533 at 2.

Proposal Four did not receive sufficient votes to pass at the meeting. If the Investor Group had voted in favor of Proposal Four, then it would have passed. The

Company announced that the polls were closed as to all items other than Proposal Four and adjourned the meeting as to Proposal Four. PTO ¶ 65.

**M.    The Company Files Suit.**

To enforce the Voting Commitment, the Company filed this action under Section 225 of the Delaware General Corporation Law ("DGCL"). On February 14, 2023, the Company reconvened the annual meeting and adjourned it again until May 18, 2023, shortly after the scheduled trial.

After a one-day trial on April 17, 2023, the Company issued supplemental disclosures designed to address issues that the Investor Group had focused on at trial.[6] Those disclosures came seven months after the issuance of the Proxy Statement and six months after the annual meeting. Technically, however, the polls remained open on Proposal Four.

First, the Company sought to address the Proxy Statement's failure to disclose that Stahl and Oliver had dissented from the Board's recommendation in favor of Proposal Four. The supplemental disclosure stated:

> In its proxy materials, the Company disclosed that the Board approved the adoption of the Authorized Shares Amendment. As the Investor Group stated publicly during the above-referenced trial, the Board's adoption of the resolution recommending that stockholders consider and vote in favor of the adoption of the Authorized Shares Amendment was not unanimous. The resolution was adopted by an 8-to-2 Board vote, with Messrs. Stahl and Oliver dissenting. The Board acts as a governing body and as a matter of policy, the Company does not disclose specific votes by members of its Board or Board votes in general, unless required

---

[6]   Texas Pacific Land Corporation, Schedule 14A (Apr. 25, 2023), https://www.sec.gov/Archives/edgar/data/1811074/000110465923049181/tm2313614-1_defa14a.htm.

19

by [the federal securities laws] or other applicable law, and expects to continue that practice in the future.[7]

Next, the Company sought to address the quotation from the Glass Lewis report in the Fight Letter, which Kurz had testified at trial was false. The supplemental disclosure stated:

As of today, the Company does not, and at the time of the Stockholder Letter, the Company did not, have sufficient shares available for issuance to meet its potential obligations with respect to all awards that could potentially be issued under its stockholder-approved incentive plans. However, the Company does have, and at the time of the Stockholder Letter did have, sufficient shares available for issuance from stock held in treasury to meet current and then-existing obligations for awards issued under the incentive plans. Furthermore, the Board of Directors of the Company (the "Board") and Compensation Committee has no current intention of issuing any awards under the incentive plans for which the Company would not be able to meets its obligations to deliver common stock. Moreover, further to disclosures by the Company in its Annual Reports on Form 10-K for the period ended December 31, 2021 and for the period ended December 31, 2022, the Company continues to believe that cash from operations, together with its cash and cash equivalents balances, will be sufficient to meet ongoing capital expenditures, working capital requirements and other cash needs for the foreseeable future.[8]

Finally, the Company sought to address the Proxy Statement's failure to reveal the existence of the Strategic Acquisitions Committee. The supplemental disclosure stated:

As the Investor Group also stated publicly during the above-referenced trial, the Company has an ad hoc special committee (the "Ad Hoc Strategic Acquisitions Committee"). On February 11, 2022, the Board unanimously approved the formation of the Ad Hoc Strategic Acquisitions Committee. The Committee has no power to approve any

---

[7] *Id.*

[8] *Id.*

20

potential transaction, and instead was created to review, analyze and assess potential acquisitions and make one or more recommendations to the Board regarding any such potential acquisitions. Directors Duganier, Epps, Kurz and Best serve on the Ad Hoc Strategic Acquisitions Committee; each Board member has attended at least one meeting of the Committee; and any member of the Board may attend any meetings of the Ad Hoc Strategic Acquisitions Committee or any other committee of the Board, absent any potential conflicts. Since its formation, the Ad Hoc Strategic Acquisitions Committee has not recommended any potential acquisitions that would involve the issuance or use of stock to the Board for approval. As a matter of policy, the Company does not disclose ad hoc committees of its Board, unless required by [the federal securities laws] or other applicable law, and expects to continue that practice in the future. [9]

The voting totals changed insignificantly after the issuance of the supplemental disclosure.

The Company planned to reconvene the meeting on May 18, 2023, and possibly adjourn it again if the court had not issued a decision. The Company believed that keeping the polls open could be necessary so that the court could grant specific enforcement of the Voting Commitment. But the Company had not updated the record date for the meeting, and there was a serious risk that the record date already had become stale.

To avoid the need for an expedited decision and to head off a potential fight over the validity of a vote based on a stale record date, the court indicated that the effectiveness of the vote on Proposal Four would rise or fall based on the vote count for Proposal Four as it existed when the polls closed on the other proposals in November 2022, plus the Investor Group's votes if the Company proved that the

[9] *Id.*

21

Voting Commitment required a favorable vote. On May 18, 2023, the Company reconvened the annual meeting and closed the polls on Proposal Four, subject to this court's decision.

## II. LEGAL ANALYSIS

The Company asserts that the Investor Group breached the Voting Commitment by failing to vote in favor of Proposal Four. The Investor Group contends that exceptions to the Voting Commitment permitted them to vote against Proposal Four. The Investor Group also contends that the Company has unclean hands because the Board did not disclose all material information when soliciting votes on Proposal Four. The Company disputes that it has unclean hands and responds that the Investor Group cannot raise an unclean hands defense because of the Investor Group's own inequitable acts, including campaigning against Proposal Four in violation of the Standstill.

### A. Governing Principles of Contract Law

The claim for breach of the Voting Agreement is a claim for breach of contract. That claim is governed by Delaware law. SA § 13.

Under Delaware law, a breach of contract claim requires "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021) (citation omitted). No one disputes that the Voting Commitment is a binding obligation.

22

When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). The "parties' intent" is a term of art. Rather than referring to what the parties' subjectively believed, it refers to the parties' shared intent as "would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (cleaned up).

If the contractual language is clear, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). A writing is clear "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

By contrast, if a writing is ambiguous, then a court must look to other sources to determine what any objectively reasonable third party would have understood the parties' intent to be. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*,

23

616 A.2d 1192, 1196 (Del. 1992). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* Nor is a contract unambiguous simply because both sides contend that its meaning is plain. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68. (Del. 2019).

If the ambiguity appears "in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision." *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998). But if one party has drafted a contract unilaterally and presented it on a take-it-or-leave-it basis, then any ambiguities "must be construed against [the party] drafting and presenting" the agreement. *Id.* at 42. That interpretive rule applies because a court looks to extrinsic evidence with the expectation that the evidence can provide insight into the parties' shared understanding. *See id.* at 43 "Therefore, unless extrinsic evidence can speak to the intent of all parties to a contract, it provides an incomplete guide with which to interpret contractual language." *Id.* The interpretative principle in which ambiguities are construed against the drafter is known as the doctrine of *contra preferentem. See, e.g., Bank of N. Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 551–52 (Del. 2013).

When looking to extrinsic evidence, a court may consider "any admissible extrinsic evidence that may shed light on the expectations of the parties at the time they entered into the [a]greement." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). Possible sources include "correspondence between

24

the parties, drafts of the [a]greement[,] and drafting session notes." *Id*. Other possible sources include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Salamone*, 106 A.3d at 374 (cleaned up). In addition, "[w]hen construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing." *Viking Pump*, 148 A.3d at 648. Some sources of extrinsic evidence, however, are not admissible. For example, "the private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning." *United Rentals*, 937 A.2d at 835.

"After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable." *Salamone*, 106 A.3d at 374 (citation omitted). In a heavily negotiated agreement, that interpretation generally will be what the court regards as "'the most reasonable meaning of the words used, when interpreted in the particular setting, including the course of negotiation and relevant commercial practices. *Harrah's Ent., Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 313 (Del. Ch. 2002) (citation omitted).

These principles apply to cases—like this one—that involve stockholder voting rights. If management has drafted an ambiguous provision addressing voting rights—or a related subject like nomination rights—and presented it on a take-it-or-leave-it basis to investors, then the court does not look to extrinsic evidence to resolve the ambiguity but rather applies the principle of *contra proferentem* to reach a result consistent with the traditional expectations. *Id.* at 311–12; *accord Centaur P'rs, IV v.*

25

*Nat'l Intergroup, Inc.*, 582 A.2d 923, 927 (Del. 1990) (requiring that limitations on voting rights be "clear and unambiguous"). But when parties have negotiated over the restriction, then a court will consider extrinsic evidence. *Harrah's*, 802 A.2d at 313. In that setting, however, it remains "important to give substantial weight to the important public policy interest against disenfranchisement." *Id.* Delaware law promotes that interest by requiring that any restriction on voting rights "be manifested in clear and convincing evidence." *Id.*; *accord Salmone*, 106 A.3d at 370–71 (adopting the logic of *Harrah's*).

For the Stockholders Agreement, there is one remaining twist, because the parties agreed on the following provision:

> *Interpretation and Construction.* Each of the parties acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed this Agreement with the advice of such counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement, and any and all drafts relating thereto exchanged among the parties will be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties, *and any controversy over interpretations of this Agreement will be decided without regard to events of drafting or preparation.*

SA § 17(g) (emphasis added). Until the last seventeen words, that provision operates as a standard disclaimer of *contra proferentem*, which is common and unobjectionable in in bilateral agreements between similarly situated parties. J. Travis Laster & Kenneth A. Adams, *Nice Try*, 101 Judicature 32, 34 (2017) ("[C]ourts shouldn't object

26

if contract parties who negotiate a transaction from a position of comparative equality elect to make it explicit that *contra proferentem* doesn't apply.").

The last seventeen words, however, are different. There, the parties agree to forego presenting evidence on the "events of drafting or preparation" (the "No Drafting History Clause"). Both sides agree that the No Drafting History Clause means what it says, but the Company argues that the provision is unenforceable.

Courts "will generally uphold the right of the parties to prescribe certain [] rules of evidence in the event of a lawsuit arising from an alleged breach of their contract, so long as it does not unduly interfere with the inherent power and ability of the court to consider relevant evidence." 7 Williston on Contracts § 15:13 (4th ed.), Westlaw (database updated May 2023) (footnotes omitted). A standard integration clause is one such provision. *See id.* The question, therefore, is whether the No Drafting History Clause goes so far that it unduly interferes with the ability of the court to consider relevant evidence.

A realistic answer to that question must acknowledge that parties agree all the time to limit the sources of evidence that a court will consider. They do so when agreeing on who will serve as document custodians, the time period to use for collecting documents, and what search terms to use. They do so when agreeing on what witnesses to depose and how long depositions will last. They do so when agreeing to procedural caps on the number of document requests, interrogatories, and requests for admissions. And they do so when agreeing on the length of trial, the witnesses who will appear, and the exhibits that will be admitted. Parties can even

stipulate to a decision on a written record, thereby foregoing live testimony. *E.g.* Ch. Ct. R. 56(h).

At times, a court might determine that good cause exists to relieve a party of its agreement or reject party agreements that interfere with the court's inherent authority to control its docket, but the vast majority of party agreements are respected and enforced.[10]

---

[10] Indeed, the Delaware Supreme Court has made clear that some party agreements on the presentation of evidence must be respected by the trial court. *Holifield v. XRI Inv. Hldgs. LLC*, --- A.3d ---, --- 2023 WL 5761367, at *31–34 (Del. Sept. 7, 2023). In *Holifield*, the parties did not ask to bifurcate the proceedings into a liability phase and a damages phase before trial, and I held what I thought was a single trial on all issues. The plaintiff did not present any evidence on damages, but in its post-trial brief, the plaintiff mentioned in four places that it had the right to recover damages. At the conclusion of a post-trial decision that was intended to address the case as a whole, I asked the parties to submit a final order or to agree on the issues that needed to be addressed before a final order could be entered. That request was intended to smoke out any lingering issues that needed to be resolved before the case could be wrapped up, not to open the door to new trials on issues that could have been part of the original trial. The parties, however, submitted a stipulation for entry of a partial final judgment under Rule 54(b) that contemplated a second trial to address damages and to litigate five other issues.

Whether to bifurcate a case is an issue for the trial court's discretion. Ch. Ct. R. 42; *cf. Younce v. Glaxosmithkline, LLC*, 2023 WL 7158056, at *1 (Del. Super. Oct. 30, 2023) (interpreting analogous Superior Court rule); *Wallace v. Keystone Ins. Gp.*, 2007 WL 884755, at *1 (Del. Super. Mar. 22, 2007) (same). Whether to permit a party to supplement the record is an issue for the trial court's discretion. *Rappa v. Hanson*, 209 A.2d 163, 165 (Del. 1965). Whether to enter a judgment under Rule 54(b) is an issue for the trial court's discretion. *E.g.*, *Stein v. Orloff*, 504 A.2d 572 (Del. 1986). Docket control generally is an issue for the trial court's discretion. *See Sammons v. Drs. for Emergency Servs., P.A.*, 913 A.2d 519, 528 (Del. 2006) (TABLE) ("The trial court has discretion to resolve scheduling issues and to control its own docket." (cleaned up)); *accord Valentine v. Mark*, 873 A.2d 1099 (Del. 2005) (TABLE).

Believing for at least four reasons that the issues of post-trial bifurcation and supplementing the record were within my discretion, I rejected the stipulated partial final judgment and, in an abbreviated ruling, explained that those issues had not been sufficiently preserved to warrant further litigation. The plaintiff appealed that decision, and the defendant who had agreed to the stipulation was hardly in a position to argue against it. The Delaware Supreme Court ruled that rejecting the parties' stipulation constituted reversible error as a matter of law. *Holifield*, 2023 WL 5761367, at *31–32. The high court directed me,

Each of those agreements affects the nature of the evidence that a court receives. Those agreements do not violate any principle of law; they are essential to the orderly conduct of litigation.

The only difference between those agreements and the No Drafting History Clause is that the former are made after litigation arises, while the latter was reached on a clear day, before any dispute. Parties likely could agree to a no-drafting history arrangement after litigation arises, and there does not seem to be any reason why they should not be able to agree to the No Drafting History Clause in advance.[11] When parties reach such an agreement when contracting, they do not know whose ox the provision will gore, so it is more likely that the arrangement is efficient.[12]

---

on remand, to consider the issues that were the subject of the parties' stipulated order and nominally left it "to [my] discretion as to whether and how the record might need to be supplemented." *Id.* at \*34. Because the parties presented no evidence on damages at the first trial, and because the Delaware Supreme Court ordered me to address that issue on remand, the parties' stipulation means that I must hold a second trial and receive evidence on damages. For present purposes, the *Holifield* decision demonstrates that parties can reach agreements that bind the court as to what evidence it must consider.

[11] In other contexts, Delaware courts generally favor decisions made on a clear day over decisions made in the heat of a conflict. *Cf. BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 980 (Del. 2020) (upholding advanced notice bylaw adopted on a clear day); *Openwave Sys., Inc. v. Harbinger Capital P'rs Master Fund I, Ltd.*, 924 A.2d 228, 242–44 (Del. Ch. 2007) (applying business judgment rule to decision to reduce size of board to eliminate vacant seats where directors acted on a clear day with no proxy contest imminent).

[12] *Cf.* John Rawls, *A Theory of Justice: Revised Edition* 120–21 (1999) ("No one knows his situation in society nor his natural assets, and therefore no one is in a position to tailor principles to his advantage. We might imagine that one of the contractees threatens to hold out unless the others agree to principles favorable to him. But how does he know which principles are especially in his interests?").

29

A Delaware court's answer to whether the No Drafting History Clause unduly limits the court's consideration of relevant evidence also must account for the contractarian paradigm that has come to dominate Delaware jurisprudence. "To say that Delaware prides itself on the contractarian nature of its law risks understatement." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565 (Del. Ch. 2023). Sophisticated parties can and should "make their own judgments about the risk they should bear," and Delaware courts are "especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1061–62 (Del. Ch. 2006).

The No Drafting History Clause is a rational way for parties to address known risks. One known risk is the impossibility of contracting completely and perfectly by both anticipating every possible future state of the world and addressing what should happen in each future state through clear language. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.). And language is an inherently imprecise medium that is invariably subject to interpretation (albeit often within a

sufficiently tight range that the meaning can be regarded as clear).[13] Ambiguity is a known risk, and parties can contract to address that risk.

Litigation expense is another known risk. Legal scholars generally posit that if the outcome a court will reach is tolerably certain, then parties will anticipate that outcome and act accordingly.[14] A corollary of that principle is that the cases a court sees involve outcomes that are difficult to predict.[15] For contracting parties, that means that the cases they can expect to litigate should be more likely to involve ambiguities, survive motions to dismiss, result in discovery, be unsuitable for summary judgment, and reach trial.[16] Faced with such a prospect, parties could rationally seek to constrain the topics for discovery and trial. Parties might believe that exploring the drafting history and course of negotiations will be expensive, or at

---

[13] For a discussion of these issues in the context of constitutional interpretation, see Paul E. McGreal, *There Is No Such Thing As Textualism: A Case Study in Constitutional Method*, 69 Fordham L. Rev. 2393, 2436–48 (2001). *See also* FEDERALIST NO. 37, at 229 (James Madison) (Clinton Rossiter ed., 1961) ("The use of words is to express ideas.... But no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally denoting different ideas.").

[14] *See* Lynn A. Stout, *Type I Error, Type II Error, and the Private Securities Litigation Reform Act*, 38 Ariz. L. Rev. 711, 714 (1996) (discussing George Priest & Benjamin Klein, *The Selection of Disputes for Litigation*, 13 J. Legal Stud. 1 (1984)).

[15] *See id.* Or at least that should hold true for parties with comparable access to resources and similar expectations. One can posit exceptions due to asymmetric information, disparate resources, or other factors. *See generally* Keith N. Hylton, *An Asymmetric-Information Model of Litigation*, 22 Int'l Rev. L. & Econ. 153, 154 (2002).

[16] I say "should" because judges are fallible. A judge could prematurely dispose of a case as a matter of law by erroneously determining that an ambiguous provision has a clear meaning (a Type I error, or a false positive). A judge might also erroneously determine that an unambiguous provision is ambiguous (a Type II error or false negative).

least more trouble than it is worth. The No Drafting History Clause is a rational response.

Other rational reasons for excluding drafting history also exist. Parties might believe that for a court to consider drafting history makes the outcome less predictable. If parties want a more predictable result, then they would opt for the No Drafting History Clause. Or parties might believe that considering drafting history helps a court get it right, while also believing that greater uncertainty is a virtue if it makes parties less likely to sue and more likely to settle. On that view, parties again would opt for the No Drafting History Clause, albeit as a check on litigation.

The fact that the parties could have a variety of sound reasons for agreeing to the No Drafting History Clause supports its enforcement. The clause could be serving a number of valid purposes, and it is not necessary to determine which might apply.

Enforcing the clause also seems warranted because it does not unduly burden the court's ability to consider relevant evidence. It allows the parties to agree on what evidence is relevant. That agreement is no different than other agreements that parties reach in the course of litigating a case.

The No Drafting History Clause also does not mean that the court cannot consider any extrinsic evidence. It only forecloses consideration of drafting history. Other sources of extrinsic evidence remain pertinent, such as trade usage, custom and practice, and the parties' post-contracting course of conduct.

The court will therefore enforce the No Drafting History Clause and resolve the case without giving weight to "the events of drafting or preparation."[17]

## B. The Clear Meaning Of The Voting Commitment

The parties agree that the Voting Commitment, standing alone, obligated the Investor Group to vote in favor of Proposal Four. The clear meaning of the Investor Group's obligation therefore turns on the Transaction Exception, the Subject Matter Exception, and the Conversion Plan Exclusion.

### 1. The Transaction Exception

The Investor Group first relies on the Transaction Exception, which applies to any stockholder vote "related to an Extraordinary Transaction." SA § 2(b)(i). The Stockholders Agreement defines an Extraordinary Transaction as "any tender offer, exchange offer, share exchange, merger, consolidation, acquisition, business combination, sale, recapitalization, restructuring, or other matters involving a corporate transaction that require a stockholder vote." *Id.* § 16(a)(v).

Because the parties defined Extraordinary Transaction, determining the scope of the Transaction Exception turns on what it means to be "related to" one of the list

---

[17] The Company separately argues that the Investor Group waived its ability to invoke the No Drafting History Clause by introducing evidence about the parties' negotiations and intentions. The Company cites Delaware Rule of Evidence Rule 105, which states, "[i]f the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." D.R.E. 105. This is a bench trial, so the court does not have to instruct a jury. The court can and will decide the case without relying on drafting history.

of nouns and nominative phrases that appear in the definition. The court's task does not involve asking in the abstract whether a particular transaction is "extraordinary."

The court also need not evaluate every noun and nominative phrases in the definition. The Investor Group only relies on four: (i) merger, (ii) acquisition, (iii) recapitalization, and (iv) "other matter involving a corporate transaction that require a stockholder vote."

### a.  Is Proposal Four Related To A Merger or Acquisition?

The Investor Group first argues that Proposal Four is "related to" a merger or acquisition. Proposal Four clearly is not part of merger or an acquisition, but it still could be "related to" a merger or an acquisition. The difficult question is how closely related must it be.

The Company argues that to be sufficiently related to the transaction triggering the Transaction Exception, the stockholder vote must be a component part of an overarching transaction. In support of that view, the Company cites how the New York Stock Exchange interprets Rule 452, which governs when brokers may vote stock without instructions from its beneficial owner. Under that rule, a broker can vote without instructions if the broker "has no knowledge of any contest as to the action to be taken at the meeting and provided such action is adequately disclosed to stockholders and does not include authorization for a merger, consolidation or any other matter which may affect substantially the rights or privileges of such stock." NYSE Rule 452. Industry professionals colloquially refer to the kinds of proxy proposals for which NYSE Rule 452 permits brokers to vote without instruction as "routine" proposals. *E.g.*, JX 701. An acquisition is not a routine proposal. *Id.*

As discussed in the Factual Background, Horizon's general counsel asked the New York Stock Exchange to address whether Proposal Four was routine in light of the discussion in the Proxy Statement about potential acquisitions. JX 440. The New York Stock Exchange confirmed that the vote on Proposal Four was routine, explaining "[i]f there was a definitive agreement for an M&A transaction (that required shareholder approval) and they needed shares to fund that transaction, we would then deem it non-routine but just providing indications of interest would not cause the proposal to be non-routine." *Id.*

Under this interpretation, the Transaction Exception applies if the Company proposes to acquire an asset using stock and conditions the transaction on a vote to increase the Company's authorized shares. The Transaction Exception also applies if the acquisition is not conditioned on the vote, but there is a signed agreement to acquire the asset and closing depends on increasing the authorized shares. Under this interpretation, the Transaction Exception does not apply if the Company proposes to increase its authorized shares before an agreement is reached.

The New York Stock Exchange interpretation is not binding, but the Company contends that it reflects how transactional attorneys would expect the Transaction Exception to operate. An obvious problem is that Rule 452 does not use the phrase "related to." It uses a different standard: whether the transaction "may affect substantially the rights or privileges of such stock." NYSE Rule 452. But it is plausible that transactional attorneys negotiating the Transaction Exception might still think in terms of familiar paradigms like Rule 452.

The Investor Group argues for a more flexible interpretation that turns on whether there is a factual nexus between the vote and the transaction. Delaware decisions generally interpret "related to" and its variants as permitting relatively attenuated connections. When interpreting a forum selection provision, the Delaware Supreme Court has held that "relating to" is a phrase that "sweeps broadly" and noted that Delaware decisions have described it is a "paradigmatically broad term." *City of Newark v. Donald M. Durkin Contracting, Inc.*, --- A.3d ---, ---, 2023 WL 5517793, at *5 (Del. Aug. 28, 2023) (cleaned up). One of the decisions that the high court cited in *Durkin* concerned indemnification and advancement rights, where this court described the phrases "relating to," "connecting with," and "arising out of" as "unquestionably broad in reach." *Lillis v. AT & T Corp.*, 904 A.2d 325, 331 (Del. Ch. 2006). Another decision from this court described the prepositional phrase "relating to" as one of the "far-reaching terms often used by lawyers when they wish to capture the broadest possible universe." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *10 (Del. Ch. Jan. 23, 2006).

Using those definitions and pointing to the factual context from which Proposal Four emerged, the Investor Group observes that the Company had been trying to pursue a strategy of growth by acquisition, wanted to use stock to make acquisitions, and had failed to secure the asset deal with Oxy or the merger with Brigham because the Company lacked stock to use as currency. For the Investor Group, that is enough to cause Proposal Four to be "related to" a merger or acquisition.

Most tellingly, the Investor Group points to the Proxy Statement, where the Company explained that it could use the additional shares authorized by Proposal Four "as consideration for the acquisition of additional assets." JX 431 at 24. Later in the Proxy Statement, the Company explained that it "desires to have the flexibility to use Common Stock as consideration for the acquisition of additional assets" and that "[a]uthorized but unissued shares of Common Stock may be used by the Company from time to time as appropriate and opportune situations arise." *Id.* And at trial, the Company's co-chairman acknowledged that "once [the shares] go into authorized but unissued there's multiple purposes for it. Of those purposes the primary – the main one would be acquisitions." Barry Tr. 314. The Investor Group maintains that while in some cases it might be difficult to determine if a vote is sufficiently "related to" a triggering event, this is an easy case because the Company has acknowledged the linkage.

The Company responds to the factual nexus argument by arguing that even if "related to" could accommodate a looser factual nexus, the clear language of the Voting Commitment requires a specific transaction. The Company points out that the Transaction Exception applies when a proposal is "related to *an* Extraordinary Transaction." SA § 2(b)(i) (emphasis added). The Transaction Exception does not use alternative formulations that would accommodate prospective Extraordinary Transactions or transactions generally, such as "is related to potential Extraordinary Transactions" or "could lead to an Extraordinary Transaction."

To that, the Investor Group answers with a basic point of grammar: English speakers use the indefinite article "an" when they are not contemplating a specific referent. "An indefinite article points to a nonspecific object, thing, or person that is not distinguished from the other members of a class. The thing may be singular {a student at Princeton}, or unaccountable {a multitude}, or generalized {an idea inspired by Milton's *Paradise Lost*}." *The Chicago Manual of Style* § 5.72 (17th ed. 2017) (emphasis removed); *see also* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.39 at 229 (4th ed. 2018) ("Use the definite article *the* to signal a specific person, place, or thing; use the indefinite article *a* or *an* to signal a generic reference.").

Both sides have advanced reasonable interpretations of this aspect of the Transaction Exception. I personally think the Investor Group has the relatively stronger reading of "related to," but I cannot conclude that the Company's interpretation is unreasonable. The combination of the Voting Commitment and the exception based on whether the proposal is related to a merger or acquisition is therefore ambiguous as applied to Proposal Four.

### b. Is Proposal Four A Recapitalization?

The Investor Group next argues that Proposal Four is a "recapitalization." This argument bypasses the ambiguity inherent in "related to," because if an increase in the number of authorized shares is a recapitalization, then the Transaction Exception applies.

The Delaware Supreme Court has held that "recapitalization" is a term that "has no generally accepted meaning in law or accounting." *Wood v. Coastal States Gas*

38

*Corp. (Wood II)*, 401 A.2d 932, 939 (Del. 1979). Its meaning is "dependent on the context in which it is used." *Wood v. Coastal States Gas Corp (Wood I)*, 1978 WL 2514, at *7 (Del. Ch. Nov. 9, 1978), *aff'd*, 401 A.2d 932 (Del. 1979). Read in isolation, the term is ambiguous.

Parties to an agreement can define the term "recapitalization," but the Stockholders Agreement does not. A court can also use context to give meaning to the term. In the Transaction Exception, "recapitalization" is one enumerated example within the following list: "any tender offer, exchange offer, share exchange, merger, consolidation, acquisition, business combination, sale, *recapitalization*, restructuring, or other matters involving a corporate transaction that require a stockholder vote[.]" SA § 16(a)(v) (emphasis added). By including a recapitalization, the parties seemingly thought they were adding something beyond what the other terms covered, so it seems logical that a recapitalization means something other than a tender offer, exchange offer, share exchange, merger, consolidation, acquisition, business combination, sale, restructuring, or other matter involving a stockholder vote. The context suggests that the meaning of recapitalization is broad and could encompass an increase in a corporation's authorized shares.

The Investor Group's argument regarding the meaning of recapitalization is all the stronger given the Company's history. For 135 years, the Company and its predecessor have not had any authorized but unissued shares. JX 51 at 15–16. The Conversion Plan initially preserved that status quo. JX 144 at 3; JX 71 at 12. The Investor Group argues that because increasing the authorized shares is a significant

39

departure from the Company's historical practices, Proposal Four should be regarded as a recapitalization.

Dictionary definitions provide another source of meaning.[18] *Meriam-Webster* defines "recapitalization" as "a revision of the capital structure of a corporation,"[19] and it defines "capital structure" as "the makeup of the capitalization of a business in terms of the amounts and kinds of equity and debt securities**:** the equity and debt securities of a business together with its surplus and reserves."[20] An increase in the number of authorized shares could fit within this definition as an increase in the amount of the equity securities of a business.

*Black's Law Dictionary* similarly defines "recapitalization" as

> [a]n adjustment or recasting of a corporation's capital structure—that is, its stocks, bonds, or other securities—through amendment of the articles of incorporation or merger with a parent or subsidiary. An example of recapitalization is the elimination of unpaid preferred dividends and the creation of a new class of senior securities.

Recapitalization, *Black's Law Dictionary* (11th ed. 2019). *Black's Law Dictionary* defines "capital structure" as "[t]he mix of debt and equity by which a business

---

[18] *See, e.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning."); *Lorillard Tobacco Co.*, 903 A.2d at 738. ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *USA Cable v. World Wrestling Fed'n Ent. Inc.*, 766 A.2d 462, 474 (Del. 2000) (explaining that a term generally should be "construed in accordance with its ordinary dictionary meaning.").

[19] Recapitalization, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/recapitalization (last visited Nov. 30, 2023).

[20] Capital Structure, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/capital%20structure (last visited Nov. 30, 2023).

finances its operations; the relative proportions of short-term debt, long-term debt, and capital stock." *Id.*, Capital Structure. And *Black's Law Dictionary* defines "capital stock" as "[t]he total number of shares of stock that a corporation may issue under its charter or articles of incorporation, including both common stock and preferred stock." *Id.*, Stock.

Chaining these definitions together, an increase in the number of authorized shares changes the Company's capital stock. A change in the Company's capital stock changes its capital structure. And a change in the Company's capital structure is a recapitalization. These dictionary definitions also favor the Investor Group.

But dictionary definitions are not a be all and end all. Words appear in sentences, and their meaning depends on context. *See U.S. v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (Posner, J.). Dictionaries present menus of meanings shorn of context, leading one distinguished jurist to call them "museum[s] of words"[21] and another commentator to call them "word zoos."[22]

The Company points to the Standstill under the principle that "[i]n n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113. The Standstill prevents the Investor Group from proposing

---

[21] Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994).

[22] A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 74 (1994).

(A) any change in the number or term of directors serving on the Board or the filling of any vacancies on the Board,

(B) *any change in the capitalization*, dividend or share repurchase policy of [the Company],

(C) any other change in the Trust's or [the Company's] business, operations, strategy, management, governance, corporate structure, or other affairs or policies,

(D) *any Extraordinary Transaction,*

(E) causing a class of securities of the Trust or TPL Corp to be delisted from, or to cease to be authorized to be quoted on, any securities exchange or

(F) causing a class of equity securities of TPL Corp to become eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act;

SA § 3(g) (formatting and emphasis added). The Company concludes that this series of terms demonstrates that "any change in the capitalization" of the Company must mean something different than "any Extraordinary Transaction"; otherwise, the refence to "any change in the capitalization" of the Company would be surplusage.

That is a strong argument, and it relies on "the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC,* 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd,* 945 A.2d 594 (Del. 2008). But as anyone who has spent time with legal documents knows, drafters are not perfect, and parties often include redundancies and inconsistencies in their agreements, whether strategically or unwittingly. The contrast between the Standstill and the Transaction Exception weighs in favor of the Company's interpretation and against

42

the Investor Group's reliance on context and dictionary definitions, but it is not a strong enough signal to establish the provision's clear meaning.

Having served as judge on the Court of Chancery for over fourteen years and as a corporate practitioner for a similar period before that, I have an admittedly subjective sense of what constitutes a recapitalization. My sense is that a recapitalization requires more than increasing the authorized shares. It generally involves bringing in capital, as in "re" (again) capitalizing the entity. The new capital could be equity or debt, but there is new money coming from somewhere. Consistent with my subjective sense, *The Oxford Learner's Dictionary* defines a "recapitalization" as "the act of providing a company, etc. with more money, especially by replacing its debt with stock (= shares in the business)."[23]

When recapitalization does not involve new money, my sense is that it generally involves changing an element of the capital structure, either by converting a class of equity into something else or by refinancing debt. Consistent with that aspect of my subjective sense, some decisions have described a recapitalization as involving "a reshuffling of a capital structure within the framework of an existing corporation." *See Wood I,* 1978 WL 2514, at *5; *accord Bernstein v. Canet,* 1996 WL 342096, at *5 (Del. Ch. June 11, 1996). My gut tells me that an increase in the number of authorized shares should not be enough.

---

[23] Recapitalization, *The Oxford Learner's Dictionary*, https://www.oxfordlearnersdictionaries.com/us/definition/english/recapitalization (last visited Nov. 30, 2023).

Ultimately, both sides have advanced reasonable readings of the term "recapitalization" as used in the Transaction Exception. On this aspect, I am inclined to favor the Company's interpretation, but I cannot conclude that the Investor Group's interpretation is unreasonable, particularly when the Company currently has no ability to issue additional shares, and when Proposal Four will change that. The reference to "recapitalization" in the Transaction Exception is ambiguous.

### c. Is Proposal Four An "Other Matter[] Involving A Corporate Transaction That Require[s] A Stockholder Vote?"

Finally, the Investor Group argues that Proposal Four falls within the Transaction Exception because it requires a charter amendment, which necessitates a stockholder vote under the DGCL. *See* 8 *Del. C.* § 242. The Investor Group reasons that Proposal Four is therefore a "matter[] involving a corporate transaction that require[s] a stockholder vote.'" SA § 16(a)(b) (the "Catchall"). This argument also sidesteps the "related to" problem, because if Proposal Four qualifies under the Catchall, then the Transaction Exception applies.

Whether the Catchall has a clear meaning turns on the phrase "involving a corporate transaction." If the Catchall applied to "matters that require a stockholder vote," then any charter amendment would meet the test. But the Catchall includes the concept of "a corporate transaction," which indicates that not all matters requiring a stockholder vote qualify.

To interpret the Catchall, the Company invokes the canon of *ejusdem generis* provides, which teaches that

44

> where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

*Aspen Advisors LLC v. United Artists Theatre Co.,* 861 A.2d 1251, 1265 (Del. 2004) (quoting *Petition of State,* 708 A.2d 983, 988 (Del. 1998)). In effect, the canon of *ejusdem generis* "implies the addition of the word *similar* after the word *other*" in the catchall language. Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 199 (2012).

Using *ejusdem generis*, "a corporate transaction" means a transaction similar to a "tender offer, exchange offer, share exchange, merger, consolidation, acquisition, business combination, sale, recapitalization, [or] restructuring." Those transactions typically involve a counterparty other than the corporation and fundamentally change the corporate form. In the abstract, increasing the number of authorized shares of common stock would not qualify.

The Investor Group responds by citing cases in which courts have used the word "transaction" to refer to a charter amendment, albeit without having had to parse the term closely.[24] The Investor Group also argues that an agreement must be

---

[24] *E.g., SI Mgmt.*, 707 A.2d at 43 n.14 (Del. 1998) ("[W]e express no opinion on the admissibility of a proxy statement to supplement or explain the effect of a *corporate transaction* (such as a merger or *amendment to a certificate of incorporation*) on which stockholders are being asked to vote.") (emphasis added); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013) (discussing the duty of disclosure that applies "[w]hen directors submit to the stockholders a *transaction* that requires stockholder approval (such as a merger, sale of assets, or *charter amendment*) ...." (emphasis added)).

"read in full and situated in the commercial context between the parties" and that "the basic business relationship between the parties [] be understood to give sensible life to any contract." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017). The Investor Group asserts that for an entity that has never had access to authorized but unissued shares in its 135-year history, an increase in the authorized number of shares is transformative. In support of this argument, the Investor Group cites testimony from Tyler Glover, the Company's CEO, who agreed that "the passage of Proposal 4 would be, in—in some senses, a—a transformative moment for the Company in having that kind of currency for acquisitions going forward." Glover Dep. 121.

The Company responds by invoking another interpretive canon—*expresio unius est exclusio alterius*. It means that "to express or include one thing implies the exclusion of the other." *Fortis Advisors LLC v. Shire US Hldgs., Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017). The Company again cites the Standstill, which specifically prohibits the Investor Group from seeking "to amend any provision of the Governance Documents," defined to include the Charter. SA § 3(e). The Company asserts that because the Standstill specifically refers to charter amendments, the omission of similar language from the Catchall demonstrates an intent to exclude charter amendments from its scope. As with the reference to a recapitalization, that is a strong argument, but it is not dispositive.

Each side has again offered a reasonable interpretation. This time I am inclined to favor the Company's position, particularly when considering the language

46

in the abstract. Yet in the context of an entity that has not issued equity in 135 years, and where the parties left open the issue of whether the Company would be able to issue additional equity after the conversion, the Investor Group's argument cannot be ruled out.

### d. Summing Up

As applied to Proposal Four, the Transaction Exception is ambiguous. The combination of the Voting Commitment and the Transaction Exception is therefore ambiguous. Put differently, it is not possible to determine as a matter of clear meaning whether the Transaction Exception applies to Proposal Four. It is therefore not possible to determine as a matter of clear meaning whether the Voting Commitment applies to Proposal Four.

### 2. The Subject Matter Exception

The Investor Group next turns to the Subject Matter Exception, which provides that the Investor Group "shall not be required to vote in accordance with the Board Recommendation for any proposals … (ii) related to governance, environmental or social matters[.]" SA § 2(b)(ii). Just as determining the clear meaning of the Voting Commitment requires considering the clear meaning of its exceptions, so too determining the clear meaning of the Subject Matter Exception requires considering the exception to the exception. That exception is the Conversion Plan Exclusion, which restores the Voting Commitment "for any proposal relating to any corporate governance terms that would have the effect of changing any of the corporate governance terms set forth in the plan of conversion." *Id.*

47

The Company argues that by using the phrase "governance, environmental or social matters," the parties only meant for the Subject Matter Exception to cover what governance professionals would understand as falling within the concept of "ESG," such as the types of proposals that stockholders frequently advance under SEC Rule 14a-8 and which relate to subjects like climate change, human rights, and board diversity. The Company argues that an increase in the number of authorized shares does not fall within that concept of ESG.

The problem with this argument is that ESG has no settled meaning. As Professor Elizabeth Pollman explains, "ESG as an acronym for 'environmental, social, governance' is a common denominator of the discourse using the term, but a deeper examination reveals that little beyond that understanding is fixed."[25] She identifies the following four principal uses of ESG since the phrase originated in 2004.[26]

- In its original version, ESG was "a way of referring to a set of issues that should be integrated into investment analysis." *Id* at 21. In this modality, "ESG is often broken into component parts of E, S, and G, and explained by reference to underlying content that would be relevant to investor decision-making. In this framing, ESG is not synonymous with ethical investing, but rather viewed as integral to mainstream investment strategy." *Id.*

- A second version uses ESG as a tool for managing risks that stakeholders identify. *Id.* at 22–24. In this modality, "the values that ESG promotes do not originate from an abstract moralistic philosophy of 'doing the right thing,' nor

---

[25] Elizabeth Pollman, *The Making and Meaning of ESG* 3 (October 31, 2022), U of Penn. Inst. for L. & Econ. Rsch. Paper No. 22-23, Eur. Corp. Governance Inst. - Law Working Paper No. 659/2022, SSRN: https://ssrn.com/abstract=4219857.

[26] *Id.* at 10 (citing *The Global Compact, Who Cares Wins: Connection Financial Markets To A Changing World* (2004), https://www.unepfi.org/fileadmin/events/2004/stocks/who_cares_wins_global_compact_2004.pdf).

are they dictated by a central standard setter rather, they arise following a wide-ranging consultation with stakeholders, who are better positioned to take notice of potentially catastrophic company operations." *Id.* at 23 (cleaned up).

- A third version equates ESG with "Corporate Social Responsibility" or sustainability. *Id.* at 24. "In this understanding of ESG as a synonym for CSR, it encompasses notions of moralistic or ethical value." *Id.* at 25.

- A fourth version associates ESG with a set of ideological preferences. *Id.* In this most controversial understanding, "investors and a wide range of stakeholders seek to align their activities with an expression of their values, whether political, ethical, or social, and ESG is a label vaguely signifying some level of attention to issues beyond the purely financial." *Id.* at 25–26.

Ultimately, Pollman explains that while "ESG" has a specific origin, it "is not a fixed concept beyond the combination of three categories of issues that comprise the acronym." *Id.* at 46. Pollman concludes that "[t]he ambiguity of ESG and varying usages … have facilitated buy-in from a great variety of market actors."[27]

The same ambiguity that has been a strength in generating support for ESG makes it difficult to use ESG as a concept with a clear meaning for purposes of contract interpretation. It is likely possible to identify core ESG issues that would be widely accepted as falling within its scope. It also likely possible to identify core ESG issues for the Company, such as declassifying the Board, such as drilling on Company land, committing to carbon neutral operations, or board refreshment. Beyond that

---

[27] *Id.*; *see* Jennifer O'Hare, *Don't Forget the "G" In ESG: The SEC and Corporate Governance Disclosure*, 64 Ariz. L. Rev. 417, 422 (2022) (including chart providing examples of relevant ESG criteria); Amanda M. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 Wash. U.L. Rev. 1821, 1822 (2021) (explaining that "'ESG' is used as shorthand for a dizzyingly broad array of 'environmental,' 'social,' and 'governance' topics affecting businesses [including] climate change, human capital management, supply chain management, human rights, cybersecurity, diversity and inclusion, corporate tax policy, corporate political spending, executive compensation practices, and more.") (footnote omitted).

core, however, the concept becomes ambiguous. In the abstract, some governance professionals might agree that increasing a corporation's authorized shares is a governance issue. Others might not. The Company has never had authorized but unissued shares, meaning that increasing the authorized shares will give the board the freedom to take action without seeking stockholder approval beyond anything the Company could have done before. In that context, more governance professionals might agree that the issue touches on governance, while others doubtless still would not.

The Investor Group argues that for purposes of contractual analysis, each individual term—"governance, environmental, or social matters"—must be given independent meaning. The Investor Group contends that is all the more true for an entity that has not had the ability to tap authorized but unissued shares at any point in its 135-year history, and where the question of whether it could issue additional shares was left off of the list of agreed-upon governance issues to be decided later.

When advancing this interpretation, the Investor Group starts with grammar. They assert that by using the phrase "governance, environmental, *or* social matters" the drafters of the Subject Matter Exception intended to afford separate meaning to the terms. To use an analogy, the category of fuel-efficient, American-made, *and* sporty vehicles differs from the categories of fuel-efficient, American-made, *or* sporty vehicles. If we imagine a conceptual space of all possible vehicles, the categories of fuel-efficient, American-made, *or* sporty vehicles could be three non-overlapping

50

subspaces. If, however, there is any area of overlap, then the reference to fuel-efficient, American-made, *and* sporty vehicles captures it.

The Investor Group also observes that the terms "governance, environmental, *or* social matters" appear in a different order than the familiar "environmental, social, and governance" sequence that gives rise to the abbreviation ESG. To use a different analogy, if the Navy routinely refers to its SEAL teams and everyone knows that SEAL is an abbreviation for Sea, Air, and Land, a listener might think that a Navy officer meant something different by referring to land, sea, or air teams. A listener might infer that the officer meant the concept of land teams, the concept of sea teams, or the concept of air teams. If a memo stated that consultation with the Naval Special Warfare Command was not required for new "land, sea, or air teams," a reader would not likely think that the phrase referred to SEAL teams.

The Investor Group's grammatical argument therefore makes some sense. But the Company has responded by locating a mix of sources that vary the order of "environmental," "social," and "governance" and which sometimes use "or" rather than "and." The Company found two examples in the Delaware code.[28] It found others

---

[28] *See* 12 *Del. C.* § 4703 (as amended Aug. 6, 2020) ("To the extent that sustainable investment strategies align with the charitable purposes of the institution, an institution managing and investing an institutional fund may take into account social, environmental or governance values."); 12 *Del. C.* § 3302 ("When investing … for the benefit of another … the fiduciary may take into account the financial needs of the beneficiaries as well as the beneficiaries' personal values, including the beneficiaries' desire to engage in sustainable investing strategies that align with the beneficiaries' *social, environmental, governance or other values or beliefs of the beneficiaries*.") (emphasis added).

in academic works,[29] ISS publications,[30] a corporate governance blog post,[31] a law firm client memo,[32] and Horizon's own prospectus.[33] Some of those examples seem to

---

[29] *See* Virginia Harper Ho, Risk-Related Activism: *The Business Case for Monitoring Nonfinancial Risk*, 41 J. Corp. L. 647, 688 (2016) (finding that, "[c]onsistent with prior trends, hedge funds sponsored *no* proposals related to *corporate governance, environmental and social, or executive compensation* in the 2014 proxy season") (second emphasis added); Yaron Nili & Cathy Hwang, *Shadow Governance*, 108 Cal. L. Rev. 1097, 1128 n.170 (2020) (noting that ISS "uses a numeric, decile-based score that indicates a company's governance risk across *Governance, Environmental & Social pillars*") (emphasis added); Susan N. Gary, *Values and Value: University Endowments, Fiduciary Duties, and ESG Investing*, 42 J.C. & U.L. 247, 298 n.302 (2016) (explaining that a study of corporate social responsibility ratings that was "based on policies and practices adopted by corporations with respect to corporate governance, environmental and social issues"); *see also* Randall S. Thomas & Christoph Van der Elst, *Say on Pay Around the World*, 92 Wash. U.L. Rev. 653, 704 n.298 (2015) (discussing reports by an investment manager whose "major goals are to enhance corporate governance, environmental and social performance and strategy"); Bernard S. Sharfman, *The Conflict Between Blackrock's Shareholder Activism and ERISA's Fiduciary Duties*, 71 Case W. Res. L. Rev. 1241, 1254 (2021) (describing how BlackRock "has ramped up its shareholder activism" and divided its management engagement "into three themes: governance, environmental, and social").

[30] JX 751 at 1 (Excerpt of ISS website describing tool for "ESG assessment of risk" and stating "QualityScore uses a numeric, decile-based score that indicates a company's governance risk across *Governance, Environmental & Social* categories.") (emphasis added); JX 102 at 1 (2020 ISS press release announcing enhancements to its ISS ESG Country Rating and stating "The ISS ESG Country Rating provides more than 100 quantitative and qualitative rating factors for more than 120 countries. It includes industry leading coverage of corporate governance, environmental and social issues …."); JX 703 at 2–3 (2018 ISS press release referring interchangeably to "environmental, social, and governance," and "governance, environmental, and social"); JX 705 at 1 (ISS blog post on Harvard Law School Forum on Corporate Governance stating "mindful investors both strive and struggle to monitor governance, environmental, and social issues").

[31] *See* JX 734 at 1 (blog post on Harvard Law School Forum on Corporate Governance by Morrow Sodali stating "Governance, social and environmental proposals all increased in volume in 2022.").

[32] JX 874 at 1 (Vinson & Elkins publication discussing current trends in ESG activism and referring to activist investors "pursuing environmental, social, or governance (ESG) goals ….").

[33] *See* JX 1108 at 8 (Horizon prospectus referring to "environmental, social or governance event or condition …;").

envision ESG as a unitary concept. Others seem to refer to social matters, environmental matters, and governance matters as distinct albeit related concepts.

The grammatical arguments are not sufficiently strong to establish a clear meaning. That is particularly so when ESG itself lacks a clear meaning.

The Investor Group next turns to the Conversion Plan Exclusion, which restores the Voting Commitment "for any proposal relating to any corporate governance terms that would have the effect of changing any of the corporate governance terms set forth in the [Conversion Plan]." SA § 2(b)(ii). Annex B lists fifteen governance terms. Some of them fall within a common understanding of core ESG issues, but others are more peripheral. The Investor Group points out that if the concept of "governance" in the Subject Matter Exception only reached a narrow set of core ESG issues, then there would be no reason for the Conversion Plan Exclusion. The fact that the parties included the Conversion Plan Exclusion suggests that otherwise, the reference to "governance" could sweep broadly. That is also a decent argument.

The Company answers by again pointing to the Standstill. That provision bars the Investor Group from proposing "any other change in the Trust's or [the Company's] business, operations, strategy, management, *governance*, corporate structure, or other affairs or policies." SA § 3(g)(ii)(C) (emphasis added). The Company argues that by only using the term "governance" in the Standstill, then including the terms "social" and "environmental" in the Subject Matter Exception,

53

the drafters must have meant for the three terms to mean something different and unique when used in combination.

That is one possibility. Concepts like "peanut butter and jelly" and "rock paper scissors" have independent meaning. Someone who dislikes peanut butter and jelly sandwiches might not dislike peanuts, butter, jelly, or sandwiches generally. But putting words in a familiar order also does not mean that separate concepts necessarily take on the meaning associated with that word order. If my spouse asks me to pick up chocolate, ice, and cream, I should not grab chocolate ice cream.

If anything, the fact that "governance" appears in the Standstill as an independent, standalone concept, then appears with "social" and "environmental" as a series of terms joined by commas and modifying "matters," makes it more likely that the three terms are being used as standalone concepts. A court strives to interpret words similarly when the same is term used in different places in the same document.[34] It therefore makes somewhat more sense that if "governance … policies" stands alone, then "governance … matters" stands alone. The reference to "governance … policies" in the Standstill thus marginally favors the Investor Group's interpretation.

---

[34] *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (listing contextual cannons of interpretation and including "the presumption of consistent usage, which provides that 'absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.'") (quoting *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *11 (Del. Ch. July 21, 2014)); *see also* Williston on Contracts, *supra,* § 32:6 ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

The Company's more credible response notes that under the Investor Group's interpretation, the Subject Matter Exception would largely swallow the Voting Commitment. The Investor Group's witnesses asserted that the term "governance" was so broad that they did not even need to vote with the Board on director elections.[35] Yet it seems obvious that if the Voting Commitment means anything, it forces the Investor Group to vote with the Board on director elections.

As applied to Proposal Four, the Subject Matter Exception is ambiguous. Each side has offered a reasonable interpretation that could support the outcome it favors. Based solely on the language of the Stockholders Agreement, the court cannot decide between them. The combination of the Voting Commitment and the Subject Matter Exception is therefore ambiguous as it applies to Proposal Four. Put differently, it is not possible to determine as a matter of clear meaning whether the Subject Matter Exception applies to Proposal Four, and it is therefore not possible to determine as a matter of clear meaning whether the Voting Commitment applies to Proposal Four.

---

[35] JX 577 at 4 (Investor Group's verified interrogatory responses stating "Proposal 1 sought the election of Dana McGinnis. Horizon Kinetics is not bound to vote for the Board's recommendations on proposals 'related to governance.' Stockholders' Agreement § 2(b)."); *id.* at 10 ("Proposal 1 sought the election of Dana McGinnis. SoftVest is not bound to vote for the Board's recommendations on proposals 'related to governance.' Stockholders' Agreement § 2(b)."); Oliver Dep. 63 (Q. And what under the Stockholders' Agreement permitted you to vote in a way that was not recommended by the Board? A. To me, a board of director is the ultimate governance issues. And governance, environmental and social matters are excluded – are carve-outs – for my obligation to vote … with the Board."); Kesslen Dep. 216–17 ("director elections are governance matters, to which Horizon retained authority to vote otherwise."); Kesslen Tr. 165 ("Q. … It's your position that based on the governance, environmental or social matters carve-out, that Horizon Kinetics can vote how it wishes on any director election. We established that. Right? A. I think so.").

### 3. The Conversion Plan Exclusion

The Company still can prevail as a matter of clear meaning if Proposal Four plainly falls within the Conversion Plan Exclusion. That proviso ensures that the Investor Group must comply with the Voting Commitment if a proposal would have the effect of changing any of the corporate governance terms in the Conversion Plan.

The Company argues that Proposal Four conflicts with a term of the Conversion Plan because, when the conversion was complete, the Company did not have authority to issue more shares. That is descriptively accurate, but it was not an agreed-upon governance term. To the contrary, the record demonstrates that the Conversion Committee and the Trustees did not agree on whether the Company would have authority to issue additional shares and tabled that issue. The Conversion Plan left it open.

The Company points to Annex A, which notes that all of the Company's shares will be distributed to holders of Trust certificates. Annex A described the steps involved in the Conversion Plan. Because there was no agreement on the Company having authorized but unissued shares, Annex A described all of the shares as being distributed at closing. That did not reflect an agreed-upon governance term in the Conversion Plan. The agreed-upon governance terms were listed in Annex B. The number of authorized shares was not one of them. That is precisely why debate continued after the conversion was complete, ultimately giving rise to this case.

The clear language of the Conversion Plan Exclusion therefore does not cause the Voting Commitment to apply to Proposal Four. That means that the application of the Voting Commitment is ambiguous because the Transaction Exception and the

56

Subject Matter Exception lack a clear meaning, which makes it impossible to determine as a matter of clear meaning whether the Voting Commitment applies to Proposal Four.

### 4. Extrinsic Evidence

Having found the Transaction Exception and the Subject Matter Exception are ambiguous, the court must look to extrinsic evidence. Under *Harrah's*, the Company bore the burden of establishing a limitation on voting rights by clear and convincing evidence, but no one disputes that the Voting Agreement limits the Investor Group's voting rights. Because the Investor Group seeks to establish an exception to the Voting Commitment, the Investor Group has the burden of proving that the extrinsic evidence supports the existence of an exception.[36]

For reasons already discussed, the No Drafting History Clause prevents the court from considering drafts of the Stockholders Agreement or the negotiating history. But there are other sources of extrinsic evidence that remain available. One source is trade usage. *Eagle Indus.*, 702 A.2d at 1232. To establish a trade usage, a party must prove that the usage is

---

[36] *See, e.g.*, *Menn v. ConMed Corp.*, 2022 WL 2387802, at *25 (Del. Ch. June 30, 2022) (holding that where the plaintiff proved that the defendants breached their obligation under a stock purchase agreement, the defendants bore "the burden of proving the existence of [an] exception"); *Snow Phipps Gp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *29 (Del. Ch. Apr. 30, 2021) ("Kohlberg bore the initial, heavy burden of proving that an event had occurred that had or would reasonably be expected to have a material adverse effect on DecoPac. If Kohlberg met that burden, then Plaintiffs bear the burden of proving that the relevant event fell within the exception ...." (cleaned up)); *AB Stable VIII*, 2020 WL 7024929, at *51 ("Buyer had the burden to prove that Seller suffered an effect that was material and adverse. After that, Seller had the burden to prove that the source of the effect fell within an exception").

57

certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become so generally known, recognized and acted on by the trade, as to raise a fair presumption that the parties in entering into their engagements, did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it.

*Paciaroni v. Crane*, 408 A.2d 946, 954 (Del. Ch. 1979) (cleaned up). The Company relied on Stephen M. Haas, a respected transactional attorney, for expert testimony about whether the Transaction Exception applied. Haas conducted a survey of 276 agreements settling director election contests between from 2017 and 2023. JX 601 ¶¶ 28–29. He identified eighteen that "specifically excluded either (i) amendments to organizational documents or (ii) authorizations or issuances of additional stock from the voting commitment." *Id.* at ¶ 40. He opined that because the Transaction Exception did not include that type of language, the Transaction Exception cannot apply to Proposal Four. For purposes of this case, the examples that Haas identified are too few to establish a trade usage.

The Investor Group relied on the testimony of Professor Guhan Subramanian, a distinguished academic, to assert that both the Transaction Exception and the Subject Matter Exception applied. Subramanian's reasoning seems like a form of trade usage in the sense that he sought to articulate what he believes everyone understands about governance. He suggested that corporate governance "is fundamentally about the 'rules of the game' among the various constituencies that the corporate form brings together." JX 593 ¶ 35. He also noted that "[c]orporate law … carefully constructs the contours of the shareholder vote requirement to provide a

vote in order to change the rules of the game between management and shareholders, i.e., corporate governance." *Id* at ¶ 37.

Starting from these premises, Subramanian reasoned that "when corporate law provides such a shareholder vote, we should infer, at least presumptively, that corporate law perceives that the contemplated change affects corporate governance." *Id*. He opined that "the fact that increasing the number of authorized shares requires a shareholder vote creates at least a presumption that such an increase reflects a change to the rules of the game, or, in other words, a change in corporate governance." *Id*. at ¶ 39. He also argued that a share authorization relates to ESG because shares can be used to "grant stock and stock options to executives." *Id*. at ¶ 66.

Subramanian also opined on the common usage of the term "recapitalization." He conducted an analysis of the historical usage of the term "recapitalization" in the *Wall Street Journal* dating back to 1892. *Id*. at ¶¶ 26–30. Subramanian's survey identified 80 articles that "used 'recapitalization' to refer to an authorization of new shares." *Id*. at ¶ 29. Subramanian further observed that there was at least one usage of "recapitalization" to refer to an authorization of new shares "in each decade through 2000, and then one more usage in 2013." *Id*. at ¶ 30. Based on this analysis, Subramanian concluded that "the term 'recapitalization' has been regularly used in the business press over the past century to refer to an authorization of new shares." *Id*.

Subramanian's analysis was insufficient to establish a trade usage. Subramanian reasoned to a logical result regarding what governance means, but he

did not show that everyone has that implicit understanding. His analysis of the historical uses of recapitalization showed that the term is used in a variety of contexts, providing additional evidence that it is ambiguous.

In response to Subramanian's testimony, the Company offered expert testimony from Marc Weingarten, an attorney with over twenty-five years of experience in activist campaigns. Weingarten described what he believed a stockholder activist's rationale would be for agreeing to certain provisions in a settlement agreement. Weingarten opined that no one would expect the Transaction Exception or Subject Matter Exception to apply to a proposal to increase the number of authorized shares. JX 600 ¶¶ 54–56, 71–73. He asserted that the Transaction Exception was intended to permit an activist to "oppose a transaction at a price the activist considers inadequate, or so they can oppose the issuance of a material number of shares to complete an acquisition which the activist thinks is ill-advised." *Id.* at ¶ 54.

Weingarten also opined that in his experience "sophisticated investors and their counsel understand a 'recapitalization' to refer to a transaction that will change a company's capital structure through the issuance of new securities or the exchange of outstanding securities for new securities, typically to improve its financial performance or to satisfy the demands of its stockholders." *Id.* at ¶ 59. He then argued that Proposal Four is not a "recapitalization" because it "does not change the capital structure of the Company in a manner that will affect the balance sheet or the rights

60

of stockholders." *Id.* at ¶ 63. Weingarten's experience-based opinion regarding the meaning of recapitalization generally tracks my own sense.

Both Subramanian and Weingarten made interesting points. Neither offered testimony that was sufficiently persuasive to carry the day.

That leaves a final and ultimately dispositive source of extrinsic evidence. "[A]ny course of performance accepted or acquiesced in without objection" is "given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202 (1981), *quoted in Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 398 n.71 (Del. Ch. 2008). "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts." *Dweck v. Nasser*, 2012 WL 161590, at *16 (Del. Ch. Jan. 18, 2012) (quoting *Radio Corp. of Am. v. Phila. Storage Battery Co.,* 6 A.2d 329, 340 (Del. 1939)).

Before the litigation began, Stahl and Oliver acknowledged that they were bound to vote in favor of a proposal to increase the number of authorized shares. As discussed in the Factual Background, after the Board discussed a proposal to increase the Company's authorized shares in September 2021, Oliver explained to his son that he was "lobbying for our ability to vote against if the Board does move forward." JX 196 at 8. Oliver would not have needed to lobby in favor of the Investor Group's ability to vote against Proposal Four if the Voting Commitment did not apply.

Stahl made similar statements in October 2021 when discussing the possibility of a proposal to increase the authorized shares with fellow stockholders. Goldstein's notes of the call reflect Stahl's understanding that as long as he served on the Board, he had to vote with the Board's recommendation. JX 210. The Investor Group argued Lawrence's notes were inadmissible hearsay, but Lawrence testified in his deposition regarding the notes, which were a recorded recollection. D.R.E. 801(5). The Company used the deposition properly at trial. Ch. Ct. R. 32(a). The content of Stahl's statements was non-hearsay. D.R.E. 801(d). Evidencing the weakness of the hearsay argument, the Investor Group only mentioned it in passing in their post-trial reply brief and did not mention it at post-trial argument. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

The extrinsic evidence regarding what Stahl and Oliver believed before litigation began is persuasive. The Investor Group has not offered any contrary extrinsic evidence that is more persuasive. The Investor Group therefore failed to prove by a preponderance of the evidence that either the Transaction Exception or Subject Matter Exception applied to Proposal Four. The Investor Group breached the Voting Commitment by failing to vote with the Board's recommendation.

## C. The Remedy

The Company seeks an order deeming that the Investor Group's shares were voted in favor of Proposal Four such that Proposal Four was approved by holders of a majority of the Company's outstanding voting power. A court of equity has the power to treat as done that "which in good conscience ought to be done." *Monroe Park v. Metro. Life Ins. Co.,* 457 A.2d 734, 737 (Del. 1983). "Pursuant to this maxim, acts

that were agreed to be done and that should have been done will be treated as if the acts contemplated by the parties had been done at the beginning of the transaction, so as to promote substance over form." 27 Am. Jur. 2d Equity § 10.

Here, what ought to have been done is for the Investor Group to have voted its shares in accordance with the Board's recommendation on Proposal Four. Deeming those shares voted in favor of Proposal Four is outcome determinative. With those shares deemed in favor of Proposal Four, the proposal received enough affirmative votes to pass. Subject to the Investor Group's affirmative defense, the Company is entitled to a judgment declaring that Proposal Four was approved by the Company's stockholders.

## D.    Unclean Hands

As a last line of defense, the Investor Group argues that the Court should refuse to grant relief to the Company under the doctrine of unclean hands. "[A] defense of unclean hands is generally unavailable to defeat a legal claim, but becomes available if the plaintiff seeks equitable relief." *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 493 (Del. Ch. 2022). The Company's request that the court deem the Investor Group's shares voted in favor of Proposal Four is an equitable remedy, so unclean hands is available. But the Investor Group did not make a convincing case for applying unclean hands.

"The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct in relation to the matter in controversy forfeits his right to have the court hear his claim, regardless of its merit." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008) (cleaned up). "[F]or the unclean hands doctrine to

63

apply, the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought." *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014) (cleaned up). The court has broad authority to consider unclean hands; it is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522–23 (Del. Ch. 1998).

The Investor Group argues that the Company's hands are unclean because the Company made two misrepresentations in its stockholder solicitation materials. First, the Investor Group relies on the statement in the Fight Letter about the Company being "unable to meet its current and potential obligations." JX 511 at 2. Second, the Investor Group asserts that the Company omitting that Stahl and Oliver voted against recommending Proposal Four was a material omission.

Assuming for the sake of analysis that these two misrepresentations were material, the assumed disclosure violations do not amount to unclean hands for purposes of a claim to enforce the Voting Commitment. That provision obligated the Investor Group to vote as the Board recommended. The commitment was contractual, and this court has held that the duty of disclosure does not apply in connection with a contractual obligation.[37] The disclosure violation therefore does not relate immediately and necessarily to the Voting Commitment. The Investor Group is also

---

[37] *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at \*5–6 (Del. Ch. July 24, 2009) (contractual right of first refusal); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004) (obligation to fulfill a capital call).

not well positioned to rely on the assumed disclosure violations because their representatives—Stahl and Oliver—knew all of the pertinent information from having participated in the discussions on Proposal Four as directors.

Separately and independently, the Investor Group cannot rely on the assumed disclosure violations because of its own inequitable conduct. When determining whether to apply the doctrine of unclean hands, the court can consider the conduct of the party asserting the defense.[38] In this case, as described in the Factual Background, the Investor Group violated the Standstill by actively campaigning against Proposal Four.

Determining whether the Investor Group's own misconduct prevents them from invoking the doctrine of unclean hands requires a weighing of both sides' actions. Intuitively, the Investor Group's misconduct should be at least equal to or worse than the Company's misconduct to block the unclean hands defense. I approach the requisite balancing with apprehension because in the recent *Holifield* case, I engaged in a similar balancing after presiding over the trial firsthand, evaluating the credibility of the witnesses, and weighing the witness testimony in the context of the evaluating the evidence as a whole. As my colleagues and I regularly do, I spent a lot of time pondering the record and lost sleep over how to weigh the evidence. Each side told a story that made its actions look justified and cast blame on the other side. Over

---

[38] *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *31 (Del. Ch. Sept. 29, 2023) (declining to apply unclean hands because, among other reasons, "[the defendant's] attempt to invoke equity unravels in light of his own misconduct.").

65

the course of thirty-four pages of Factual Background, I made findings that described what I found had happened based on a preponderance of the evidence. Under my weighing of the evidence, one side's actions seemed willful and strategic, while the other side's actions seemed to have resulted from misinterpreting the signals that the counterparty was giving and reliance on the advice of counsel.

No one challenged my factual findings on appeal. *Holifield*, 2023 WL 5761367, at *34. The Delaware Supreme Court nevertheless offered a series of devil's-advocate observations and rhetorical questions before concluding that "based on the record as we view it, the questionable conduct is not tilting so heavily in either side's favor, and we are not convinced that the result in [the plaintiff's] favor is 'disquieting' and 'inequitable.'" *Id.* The references to "not tilting so heavily" and "not [being] convinced" sound like a court making a factual finding based on a preponderance standard. On appeal, of course, reversing a finding of fact requires clear error, yet the justices expressly stated that they were *not* "suggesting, by these comments, that [the factual findings] are clearly erroneous, particularly as some of them are based upon credibility determinations." *Id.* Instead, the high court concluded that the factual findings were "incomplete" and remanded for further determinations. *Id.*

I will try to do a better job spelling out why, in this case, I regard the Investor Group's actions as more serious than the Company's. No one disputes that the clear language of the Standstill barred the Investor Group from opposing Proposal Four. Stahl and Oliver knew that. Yet as described in the Factual Background, they violated the Standstill in multiple ways and over a prolonged period of time. Not only

66

that, but they sought to conceal their conduct by avoiding a document trail.[39] At trial, their witnesses did not come clean about their breaches but rather offered less than credible testimony on several points.[40]

By contrast, the two disclosure issues in the Company's solicitation materials look like breaches of the duty of care. In the Fight Letter, the Company quoted a statement from the Glass Lewis report about being unable to meet its stock-based obligations. Although it is true that one of the Company's directors testified at trial that this statement was false, he did not seem to be using this term in the sense of a statement made with *scienter*. It also seemed that he was surprised by the content of the statement and believed that the Company would not have undertaken obligations that it could not fulfill. I give him credit for testifying candidly that he thought the

---

[39] During his campaign against Proposal Four, Oliver responded to outreach about how stockholders should vote by asking that they "call him." *E.g.*, JX 444 (Oliver responding "Y[es] Call me when you want to discuss" to text from a Company stockholder stating "I wanted to vote TPL the way that helps you most. Can you direct me?"); JX 482 (Oliver responding "Call me" to outreach from Clift, an investment advisor, regarding "how I should encourage my investors to vote on the TPL proxy"). Oliver also strategically used a recommended ballot posted by a Company stockholder on his blog to instruct stockholders to vote against Proposal Four with out expressly stating so. *E.g.*, JX 448, JX 449, JX 453; *see also* JX 509 (Oliver responding to request from stockholder regarding Oliver's take on Proposal Four by stating "There is a blog I'll send you a link. He has a recommended ballot.").

[40] For example, the record reflects that Oliver instructed Company stockholder Alexander to "spread the word" against Proposal Four. JX 451 at 4 (Alexander discussing blogger's recommended ballot and stating "[Oliver] asked if I would help spread the word to shareholders."). When confronted with Alexander's emails at trial, Oliver did not admit to his subterfuge and instead had what appears to be a selective loss of memory. Oliver Tr. 286. Similarly, Oliver refused to admit at trial that he had suggested to Alexander or others how to vote. *Id.* at 285 ("Q. Is it your testimony you never suggested to Minor Alexander or others how to vote? A. I pointed people to a public website, that TPL blog, and did not represent how I was voting. Q. So I guess the answer is no, you never suggested to Minor Alexander or others how to vote? A. Correct.").

67

statement was wrong, even though it appeared in one of the Company's disclosure documents. In its supplemental disclosures issued after trial, the Company explained why that quotation in the Glass Lewis letter was correct. Without accepting the contents of the supplemental disclosure for its truth, it is still possible to understand how the Glass Lewis quotation in the Fight Letter could have been true, even if it was something that one director later thought was untrue. An inaccurate disclosure in that setting seems more likely to have resulted from a breach of the duty of care.

The failure to disclose that Stahl and Oliver voted against recommending Proposal Four also seems like a breach of the duty of care. Delaware law supports viewing that omission as material. [41] Under the federal securities laws, however, it is not clear that disclosure is required. Here again, the Company addressed the issue in its supplemental disclosures, stating that the Company followed a policy of not disclosing dissenting votes. Without accepting the contents of the supplemental disclosure for its truth, it is easy to imagine that directors relied on counsel and did not act disloyally.

Persistent, willful breaches of a clear contractual provision are more serious than two, temporally isolated disclosure violations that do not appear to have been

---

[41] *See Appel v. Berkman,* 180 A.3d 1055, 1061–62 (Del. 2018) (holding chairman's reasons for abstaining from voting in favor of transaction recommended to stockholders were material, as were chairman's reasons for abstaining; rejecting argument that "a director's reasons for dissenting or abstaining from a decision of the board can never be material in the sense that they require disclosure").

willful. In my judgment, the Investor Group's more serious misconduct prevents them from invoking the defense of unclean hands.

## E. The Company's Relief Is Conditioned On The Stock Split.

On its face, Proposal Four calls for increasing the authorized common stock from 7,756,156 shares to 46,536,936 shares—a sextupling of the authorized common stock. To minimize the significance of that increase, the Company repeatedly stressed during this litigation that the bulk of the shares will be used for a 3-for-1 stock split. But the Company never committed to the split. Having relied on the split for purposes of this case, the Company cannot now walk away from it. Consequently, the final order will condition the increase in the authorized shares on the Company completing the split. If the Company does not complete the split, then the additional authorized shares will be void.

## III.   CONCLUSION

The Investor Group breached the Voting Commitment by failing to vote with the Board's recommendation in favor of Proposal Four. The Investor Group's shares are deemed voted in favor of Proposal Four, which is deemed approved by holders of a majority of the Company's common stock. The Company is entitled to an award of costs as the prevailing party. Within thirty days, the parties will submit a joint letter that either attaches an agreed-upon form of final order or identifies any issues that remain to be addressed and proposes a procedure for resolving them. The invitation to identify issues is not intended to provide an opportunity for a full or partial do-over. It is designed to enable the parties to ensure that the court has addressed all of the matters that the parties have fairly put at issue.

69